

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| **JOHNNY W. WOODS, et ux** | **CIVIL ACTION NO. 1:05-cv-02048** |
| -vs- | **JUDGE DRELL** |
| **REYNOLDS INDUSTRIAL CONTRACTORS, INC., et al.** | **MAGISTRATE JUDGE KIRK** |

## REASONS FOR JUDGMENT

Plaintiffs, Johnny W. Woods and his wife, Andrea Woods, filed this suit seeking compensation for damages they allegedly sustained beginning in October 2004 when Mr. Woods was exposed to asbestos during his employment. Issue has been joined, and jurisdiction is proper under 28 U.S.C. § 1332. The matter was tried before this Court, and all appropriate post-trial submissions have been made. Given the November 27, 2006 Judgment dismissing Plaintiff's claims against his employer, Reynolds Industrial Contractors, Inc., with prejudice (Document No. 33), Calumet Lubricants Co. is the only remaining defendant. For the reasons set forth below, this Court renders judgment as follows: in favor of Plaintiff, Johnny W. Woods, and against Defendant, Calumet Lubricants Co., in the amount of $548.00 in medical expenses, plus $824.00 in expert fees and depositions costs, for a total of $1,372.00 plus legal interest and costs as provided by law. All of Plaintiffs' remaining presented claims will be DISMISSED with

prejudice, but the dismissal will be without prejudice to any claims for actual contraction of a related disease should the same ever arise.

## The Evidence

*Testimony of Johnny W. Woods*

Mr. Woods, who was forty-eight years old at the time of trial, was employed by Reynolds Industrial Contractors, Inc. ("Reynolds") and was working as a structural fitter at a refinery owned by Calumet Lubricants Co. ("Calumet") (formerly Atlas Refinery) in Shreveport, Louisiana. On October 23 or 24, 2004, Mr. Woods and other members of his crew were instructed to begin demolition on existing pipe and insulation, despite signs located on the structural columns supporting the pipe rack and on the adjacent compressor building, which signs warned of an asbestos danger if dust were created. (Document No. 55, pp. 9 - 11.) During the course of removing corrugated siding material from the building, Mr. Woods noticed "a lot of dust particles flying everywhere . . . ." (Id. at 12.) Mr. Woods asked his supervisor, Danny Slack, about the particles. Mr. Slack, in turn, went to speak with Richard Kelly, a superintendent for Reynolds. When Mr. Slack returned approximately twenty minutes later, he had two dust masks with him. It was Plaintiff's understanding that as a result of information received from representatives of Calumet, Mr. Slack told Plaintiff to continue working, but to use a dust mask.

2

Subsequently, after Mr. Woods and his crew caused more of the siding to fall to the ground, a Calumet employee told the men to stop working around the siding. Mr. Woods estimated he worked ten to twelve-hour shifts for four or five days around the dust particles. An abatement crew then arrived and barricaded the area, at which point Mr. Woods was no longer exposed to concentrations of the particulate matter. A member of the clean-up crew informed Mr. Woods that the dust particles contained asbestos. (Document No. 55, pp. 13 - 17.)

Mr. Woods, who previously had a member of his extended family die from mesothelioma, then became concerned for his health. Therefore, he saw a pulmonary specialist, Dr. Peré, who performed several tests and did not identify any type of lung disease. At the time of trial, nearly five years after "exposure," Mr. Woods had not developed any disease related to asbestos. Although he did experience occasional nosebleeds following the incident, it was Plaintiff's understanding Dr. Peré did not find a causal connection between the nosebleeds and the asbestos. Mr. Woods confirmed he missed a few days of work for medical evaluations and consultations with his attorney, but he did not accrue any absences as a result of illness or injury. Mr. Woods's main complaints were that he had not been given a safe place to work, and that he had experienced anxiety and stress regarding whether he might contract an asbestos related illness in the future. Mr. Woods confirmed he had not sought any type of counseling or psychiatric treatment related to his exposure. He also expressed concerned for

his wife and children, because his work clothes were washed at his home. (Id. at 18 - 23.)

Under cross-examination, Mr. Woods admitted that although he was first exposed to asbestos in October of 2004, he did not visit Dr. Peré until August 2005. He also clarified that no representative of Calumet ever directly told him to continue working in the vicinity of the asbestos. Rather, he believes "Mr. Johnson," a Calumet employee, told Plaintiff to stop working around the dust particles at some point before the abatement crew arrived on October 25, 2004 at 4:00 P.M.. (Document No. 55, pp. 23 - 27, and 35 - 36.)

Under questioning from the Court, Mr. Woods testified it was his understanding the asbestos came from the wall panels and the insulation on the pipes that were being demolished. He also confirmed he had used the dust mask for only one day, because on subsequent days, he was told there were no masks available. (Id. at 27 - 32.)

*Testimony of Andrea Woods*

Mrs. Woods, who has been married to Johnny W. Woods since August 1982, testified her husband expressed concerns for his health secondary to asbestos exposure at the Calumet refinery in Shreveport. He also told her he was worried that Mrs. Woods and one of their daughters may have been exposed to the fibers while washing Mr. Woods's work clothes. She confirmed that neither she nor her children have experienced any symptoms related to asbestos

contamination, and they have not sought medical treatment of any kind. However, she is concerned regarding the possibility she, her husband, or the children may develop physical problems in the future. (Id. at 38 - 42.)

*Factual Stipulations*

At the close of the evidence, the parties stipulated Mr. Woods was, in fact, exposed to materials containing asbestos, and that, as of the trial date, he had not been diagnosed with any known asbestos related disease. (Document No. 55, pp. 49 - 50.)

*Medical Bills*

The only medical bills submitted by Plaintiffs total $548.00 for testing and examination of Johnny Woods by Natchitoches Pulmonary Associates on August 16 and 18, 2005. (Joint Exhibit 7.)

*Deposition of Dr. Javier Peré*

Dr. Javier Peré, a physician who is board certified in pulmonary medicine, testified he examined Johnny Woods on August 18, 2005 for complaints of coughing, chest tightness and nose bleeds. Plaintiff's physical examination at that time was normal. Dr. Peré explained that symptoms and physical objective findings from asbestos exposure take between ten and forty years to manifest themselves, and that whether any disease develops at all depends upon the length of exposure and the amount of asbestos involved. He further stated there is no medication that can be taken to prevent asbestosis if a person has had a

"severe enough exposure." (Joint Exhibit 9, p. 8.) Rather, Dr. Peré would simply suggest a person stop working around asbestos, not smoke, and have routine medical examinations to discover any potential signs of illness. The physician specifically noted he did not know what degree of exposure Mr. Woods had experienced, and he could not predict whether Mr. Woods would ever become symptomatic. (Joint Exhibit 9.)

Dr. Peré charged $750.00 for his deposition testimony and Plaintiffs' counsel paid the court reporter $74.00. (Joint Exhibit 4, pp. 11 - 12.)

*Calumet's Records*

A "Bulk Asbestos Analysis Report" dated October 26, 2004 shows samples of Thermal System Insulation ("TSI") from Calumet Lubricants were tested and found to contain 20 - 22% amosite, which is a type of asbestos. (Joint Exhibit 10, p. 93 and Joint Exhibit 5, p. 41.) On October 26, 2004, Calumet submitted to the Louisiana Department of Environmental Quality a form titled "Asbestos Notification of Demolition and Renovation," showing that on October 25, 2004 at 4:00 P.M., ARC Abatement began removal of twenty linear feet of pipe and one cubic yard of asbestos containing material from the Calumet Refinery in Shreveport. The portion of the form explaining how the event occurred states, "Contractor removed approximately 20 lf of 12" pipe not knowing TSI [Thermal System Insulation] that was remaining was ACM [asbestos containing material]. ACM distributed in concentrated area of pipe rack." (Joint Exhibit 10, pp. 97 - 98.)

## Law and Analysis

Generally, a premises owner has a duty of exercising reasonable care for the safety of persons on its property and a duty of not exposing persons to unreasonable risks of injury or harm. Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La. 1993). This duty extends to the employees of independent contractors for whose benefit the owner must take reasonable steps to ensure a safe working environment. Donavan v. Jones, 658 So.2d 755 (La. App. 2d Cir. 1995) (citing Dupre v. Chevron U.S.A., Inc., 20 F.3d 154, 157 (5th Cir. 1994)). Under La. Civ. Code art. 2317.1,

> The owner ... of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

Although the record contains limited evidence regarding the manner in which the asbestos exposure occurred, there is sufficient information for the undersigned to find Calumet was aware of the presence of asbestos containing materials in the work area, as shown by the placement of warning signs, and that it failed to remove the insulation before Plaintiff and his crew began the demolition work. Thus, Calumet breached a duty it owed to Mr. Woods, and it is liable for any damages caused by that breach.

In addition to the medical expenses he has incurred to date, Mr. Woods argues he should recover "the reasonable costs of medical monitoring of his

condition, together with an award for anxiety and emotional distress suffered and likely to be suffered in the future from his significant exposure to asbestos." (Document No. 56.)

Regarding the "medical monitoring" claim, as the Louisiana Supreme Court has explained,

> Effective July 9, 1999, Acts 1999, No. 989 amended La. C. C. art. 2315 to provide that "damages do not include costs for future medical treatment, services, surveillance, or procedures of any kind unless such treatment, services, surveillance, or procedures are directly related to a manifest physical or mental injury or disease." Thus, the amendment effectively eliminated medical monitoring as a compensable item of damage in the absence of a manifest physical or mental injury or disease.

Bonnette v. Conoco, Inc., 837 So.2d 1219, 1230, n. 6 (La. 2003).

In the instant case, the parties have stipulated Mr. Woods has not been diagnosed with any asbestos related disease. Dr. Peré has recommended nothing more than regular physical examinations, and he has not established any sort of criteria or time frame for same. Thus, the law and evidence do not support any award for medical monitoring.

As to Mr. Woods's claims for mental anguish damages, counsel for Plaintiffs and Defendant agree the seminal case in this area is Bonnette v. Conoco, Inc., 837 So.2d 1219 (La. 2003). In Bonnette, the Louisiana Supreme Court elaborated upon its holding in Moresi v. State, Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La. 1990), "that a defendant will generally not be held liable where his conduct is merely negligent and causes only emotional injury unaccompanied

by physical injury" absent certain "'special circumstances, which [serve] as a guarantee that the claim is not spurious.'" Bonnette, 837 So.2d at 1234. Justice Kimball, writing for the majority, noted that Moresi,

> [M]ust be stringently applied in asbestos exposure cases [because of] their inherently speculative nature, in order for plaintiffs to recover emotional distress damages in the absence of a manifest physical injury, they must prove their claim is not spurious by showing a particular likelihood of genuine and serious mental distress arising from special circumstances."

Bonnette, 837 So.2d at 1235.

We have scoured the record, and we simply find no such "special circumstances." The parties have indeed stipulated that Mr. Woods was exposed to asbestos. However, the only hard evidence regarding the degree of that exposure is that the abatement crew removed twenty linear feet of pipe and one cubic yard of asbestos containing material. (Joint Exhibit 10, p. 97.) Plaintiffs ask us to extrapolate that because a certain amount of asbestos containing material was removed, Mr. Woods must have been exposed to that amount of asbestos containing material. There is no evidence, however, to substantiate such a conclusion. Even if we could make such a logical leap, we have no evidence to explain what the consequences of the exposure would be. Plaintiffs put forth no testimony, expert or otherwise, regarding whether the bulk asbestos translated to inhaled or respirable fibers, and, if so, the quantity of asbestos fibers to which Mr. Woods was actually exposed.

Dr. Peré opined that the likelihood of contracting an asbestos related disease is directly tied to the length of exposure and the amount of asbestos involved. (Joint Exhibit 9, p. 7.) Regarding Mr. Woods's exposure, Dr. Peré stated:

> I believe the chances of developing asbestosis are less – if you are exposed in a heavily contaminated atmosphere for only one day than if you were to continue in that atmosphere for a long period of time. I don't know, particularly Mr. Woods, I don't know how heavily – what he told me and the description is a typical description for a contaminated atmosphere or something that could cause asbestosis if he were to work in that particular area for a prolonged period of time.

(Id. at 10 - 11.)

In their Petition, Plaintiffs contend the exposure began on October 24, 2004. (Document No. 1.) At trial, Mr. Woods testified the demolition work started on October 23, 2004, he wore a dust mask for at least a portion of one day, and he thinks the abatement team arrived and barricaded the contaminated area on October 25, 2004 at 4:00 P.M. (Document No. 55, pp. 9, 13, and 27.) Calumet's records show the asbestos removal was completed by October 27, 2004. (Joint Exhibit 10, p. 97.)

Thus, we simply cannot find Mr. Woods was exposed to the asbestos fibers for a prolonged period of time, such that it would be reasonable, under the testimony of Plaintiffs' own physician, for him to have anything more than a highly speculative claim. We also note Mr. Woods has not sought any type of counseling or treatment related to his alleged mental trauma.

All this evidence taken as a whole fails to establish "a particular likelihood of genuine and serious mental distress arising from special circumstances," as required by <u>Bonnette</u> to support an award of compensatory damages for emotional distress.

We do find it reasonable, however, that Mr. Woods sought an initial medical evaluation, in light of what the Louisiana Supreme Court recognized as the general public's "degree of anxiety concerning exposure to asbestos and asbestos-containing materials." <u>Bonnette</u>, 837 So.2d at 1236. Accordingly, we find Calumet is responsible for his itemized medical bills and expert-related costs.

Under the analysis expressed above, the record is completely devoid of evidence Andrea Woods sustained any compensable emotional distress or consortium damages.

## Conclusion

For the foregoing reasons, this Court RENDERS JUDGMENT AS FOLLOWS: IN FAVOR OF PLAINTIFF, Johnny W. Woods, and against Defendant, Calumet Lubricants Co., in the amount of $548.00 in medical expenses, plus $824.00 in expert fees and depositions costs, for a total of $1,372.00 plus legal interest and costs as provided by law. All of Plaintiffs' remaining presented claims will be DISMISSED with prejudice.

SIGNED on this _29_ day of March, 2010, at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE